Professional Airline Flight Association v. Spirit Airlines Okay, Mr. Braswell. May it please the court. Good morning, Your Honor. Good morning. Marcus Braswell, Sugarman, Susskind, Braswell, and Herrera. We are here on behalf of the appellant from the Union, Pasco. This case presents a single-question law, a question to which the Supreme Court has given a clear and definite response. Is an employer required to comply with the bargaining procedures set forth in Section 6 of the Railway Labor Act before it unilaterally changes status quo with respect to working conditions that have never been the subject of the agreement, even if the Union has not given Section 6? It seems to me that the Supreme Court has given us some clear guidance that makes your burden difficult this morning about whether there's a jurisdictional problem here. So, in this case, it seems to me, in terms of whether this is a major or minor dispute, and the Supreme Court has said that distinction between a major and minor dispute does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help. So, the question is whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. And if the employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified, say low standard, by the terms of the party's collective bargaining agreement. So, so long as the employer's claim that what they're doing is arguably justified and is not frivolous or insubstantial, then it's a minor dispute that we lack in the federal court-side jurisdiction. They've got a pretty good argument, or at least, it seems to me, a non-frivolous argument that they could transfer part of these operations to a second control center. Why is that not right? We do understand that that is the issue, and we do not disagree with your characterization of the case law principles that apply here. Okay. The reason that this case is not controlled in the way that the lower court described it is because when you harmoniously read the three major cases on this, Conrail, Pittsburgh Lake Erie, and Shoreline, you will see that the dispute arose from bargaining a new provision in the CPA. And in reaching that decision, the lower court erroneously, from the NRA, it borrowed principles of retained management rights, and it did so in a way that conflicts with the RLA. If I might. Yeah, the problem, it seemed to me, with Shoreline is that what you have there is you have a status quo proceeding, right? A Section 6 proceeding that's wholly different from this context. That may have been the case, but when you read Pittsburgh and Lake Erie, you will see that that would make it a distinction without a difference. See, the problem is that Shoreline is really a different case, because in Shoreline, the parties agreed, did they not, that the disputed issue was a major dispute? There was a Section 6. They agreed it was a major dispute. The problem I have, and you can help me with it specifically here, is if you look at Section 18A of this collective bargaining agreement, it says in no uncertain terms, and I quote, that spirit retains the right to manage and operate its business and workforce, including to transfer operations or part of operations. It would seem to me that it's a pretty good argument to say that the plain and ordinary meaning of the phrase to transfer operations or parts of operations would seem to encompass a right to move some or all of spirit's dispatch operations from one facility, i.e. in Miramar, to another facility, Orlando. Why isn't that at least fairly an arguable position based on the language in Section 18A of this CBA? Thank you for the question, Judge Marcus, and the very straightforward answer is because of Shoreline. Retaining the rights that you have as an employer in the RLA context, it means that you have retained rights that already exist. And here, Shoreline, with its facts that are remarkably indistinguishable, it tells us that the right to assign employees to a second work location unilaterally would not be one of those rights that spirit retained here. Shoreline, again, predated this contract, of course, and in that case, the Supreme Court found that changing unilaterally in workplace assignments of employees who had reported to the same place for many years was the type of unilateral change prohibited by the Railway Labor Act. But wasn't that a different question the Supreme Court was answering? In Shoreline, they weren't answering the question of whether a dispute was major or minor. The parties had already conceded the dispute is major. That's why I'm not sure I get how Shoreline gets you over the burden of the language in 18A. Well, Shoreline also followed a principle found in the telegrapher's case. I can get that numerical citation if you like. But that also discussed the fact that unilaterally reassigning employees to a new work location is the very type of unilateral action that the RLA prohibits. If I make Shoreline, yes, it is a lower standard, but it's a standard that exists nonetheless. And what we would point the court's attention to is a warning, if you will, that I'm sorry, I'm speaking of Conrail. Conrail's standard, yes, low. But the Conrail court warned us, courts of appeal early recognized that there is a danger in leaving the characterization of the dispute solely in the hands of one party. In a situation in which the party asserting a contractual basis for its claim is insincere in so doing, or its position is founded upon insubstantial grounds. In such circumstances, protecting the functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant. You're not running from Conrail. We embrace it. I have a question for you. So you're reading of Section 18A. What are the retained rights at all? Or is that whole provision superfluous? Well, one retained right could be the right to shut down operations completely or to merge with another airline, which is actually what is happening there. What it does not include is the right to unilaterally change the status quo. Even though the parties, as Judge Marcus read, agreed that the airline retained that right? I mean, it's explicitly in 18A. The parties explicitly agreed that management retained the rights that it had to manage its business at the time. What it did not have the right to do because of the Shoreline decision, which has never been overruled, and because of the principle also enunciated in Telegraphers, did not include, by definition, the right to unilaterally reassign. As Judge Marcus explained, Shoreline is not dealing with this situation at all. We're in a major disputed area. And Shoreline also had to deal with implied terms. Here, it's right in the CBA. What does that provision mean that Judge Marcus read, the ability to transfer part of the operations? What does that mean in your view? It means that it would have the right, possibly, to move its flight operations. But, again, it does not include the right to unilaterally reassign employees to a new work location. They're just opening a new center. They're not reassigning. Even under your definition, I don't understand how the management is barred from doing what they did. Because the retained rights are part of rights that necessarily exist outside the contract. And that is another area that makes this into a major dispute. The court relied on a case, ABX, which was an RLA case. But the principle of retained management rights in that case had only to do with NLRA principles. Okay. I think we understand, Mr. Brazzell. You've saved five minutes for Roberto.  Thank you. Good morning. Doug Hall for Spirit Airlines. Your questioning of Mr. Brazzell has honed in on the issue here. This case is controlled by Conrail. It's a minor dispute, and it's not even close. The 18A of the collective bargaining agreement retained to Spirit a whole panoply of rights. These kinds of clauses came about in large part because of the dispute over what is the impact of silence on management rights for something that's not addressed in the collective bargaining agreement. So this clause specifically says, except as limited by express provision of the CDA, the company retains all rights that it previously had before it had collective bargaining agreement to manage its workforce and operations, including, but not limited to, transfer part or all of its operations. That, in and of itself, this report held. I'm curious, in your view, did that give Spirit the power not only to open up another satellite in Orlando, but to require that Miramar folks move if they wanted to keep their job? That would be a question for the arbitrator. Frankly, that's one of the things that the union could have negotiated restrictions on. There are provisions in the collective bargaining agreement that deal with the effects that do have to be bargained over with respect to relocation. Those are limited to moving expenses and the union's impact on ergonomics. So, arguably, that would not require or restrict the company's ability to require employees. Right, but would you cite 18A for the proposition? And I understand that's not what happened here. I start with that premise. And you can say, thanks, it's an interesting academic question, Marcus, but that's not what we have here. I'm asking the question, I'm curious if, in fact, they not only opened an office in Orlando, but said to half of their staff in Miami, if you want to keep your job, you move into Orlando. Would they do that under 18A? Or would they have to look elsewhere for the power to move the employees as opposed to opening a new office? My position would be that 18A would give them an arguable justification for requiring that. And whether they could do that or not would be up to the arbitrator. There's enough in 18A, both in the transfer of operations language and some of the other rights that are reserved. And remember, those are a non-exhaustive list of rights. So, there's a lot of discussion in the briefs and in Mr. Breswell's opening about Shoreline. Shoreline has nothing to do with this case. Conrail itself said that. It's a Section 6 case. I'm sorry? It's a Section 6 case. It's a Section 6 case, and it had to do specifically with the, what is the extent. Everyone agrees it's a major dispute there, right? That's correct. And had to do with, do we limit ourselves to the status quo that's just written? Or could there be other things that are part of the status quo in that major dispute context? Conrail said it has no application when we're dealing with major, minor. And 6th, 7th, 8th, 9th Circuit have all specifically rejected arguments to read Shoreline in that fashion. I think you all should do the same. Pittsburgh and Lake Erie does not help their case either. Pittsburgh and Lake Erie was neither a minor nor a major case. In fact, if you go back to the 3rd Circuit's decision in PNLE, they said the railroad has not made an argument that this was covered by the CBA. If it had, if that was the crux of the argument, we would find the dispute minor. But that wasn't the argument. The argument in PNLE was this isn't subject to either of the RLA's dispute resolution processes. This is a matter of management prerogative to shut down our operations. So that had nothing to do with major, minor. It was decided two days after Conrail, after the court spent a lot of time in Conrail coming up and developing the standard and explaining the standard of how we decided minor versus major. There's nothing in PNLE that suggests that that was intended to change anything in that calculation. Again, to us, the management rights clause in itself is sufficient to get us past our low burden. Judge Marcus, you were on the panel in the NWE case that this court decided where you talked about how this is a low burden that a party must meet in order to satisfy the major minor. And that any doubt over whether a case is major or minor is resolved in favor of finding it minor. We believe we've made that case. I would also refer you back to the 11th Circuit's decision in Empresa Equatoriano, which is cited in our materials, where the union made a very similar argument, which is that any assertion by management of authority to take action that's not specifically set out in the contract is a major dispute. And the court rejected that, saying that would transform what are minor disputes into major disputes and upset the dichotomy that the act has created and how those disputes are resolved. That's also inconsistent with Conrail, which said there's no obligation in labor law, either RLA or NLRA, to have the company negotiate every single potential working condition and freeze it into the collective bargaining agreement. Rather, they can negotiate management rights clauses or other types of clauses that give them flexibility. And that's what we've done here. There are no more questions. I will give the rest of my time back over to Mr. Bradham. Thank you. Mr. Bradham, you've got five minutes. Your Honor, Spirit's position and its actions here are destructive of the text of the RLA, which prohibits taking self-help actions before the procedures for bargaining and mediation are exhausted from Section 6. And the effect of it would be an argue to turn all disputes into minor disputes. And that is not the law. There are minor disputes and there are major disputes under the RLA. Some of the points made by opposing counsel regarding things that are granted to management, except as limited by an express provision or the fact that... Except as limited by an express provision. That's an NLRA principle. And it's one of the major reasons that we're here before you today, because that is what the lower court did. Applied these NLRA principles to an RLA context when that is not justified. The essential inquiry is, does a provision, either express or implied, exist in the contract which govern the matters in dispute? And here, there was none. And so if that's not the case, then we have a bargaining dispute, which is what we have here. And it must be resolved through bargaining. And it becomes a major dispute when one party takes the unilateral action. Arbitrators, they don't have jurisdiction when there is a dispute over the characterization of whether a dispute is major or minor. And further, let me, if I may, recall some of the facts here that the parties sat down to bargain. They reached an MOU, which would have been an amendment to the bargaining agreement. And after the SPIRT employees who are members of PACTA rejected that proposed MOU, shortly thereafter, the company advised that it was going to move forward unilaterally, abruptly withdrew from bargaining, and essentially scoffed at Union Council's request to continue bargaining to avoid this very scenario. If you look at the appendix of pages 128 and appendix 1, you will see the letter that we sent advising that bargaining needs to be pursued further in this matter. Under SPIRT's interpretation of Article 18, its Management Rights Clause, we could see a much graver scenario where it decides to move part of its operations to an extraterritorial office location. If they think that they can move part of their operations to Orlando, what's to stop them from moving them extraterritoriality, sorry, to an extraterritorial location where they're not obligated to follow the RLA? There have been employers in this court which took that position that an extraterritorial office location meant that it didn't have to follow an RLA contract anymore at all. At the very least, we would say that this case should be remanded for discussion as to the application of Pittsburgh and Lake Erie to these facts. They say that because the lower court found some significance, we think erroneously, to the fact that the union hadn't provided a Section 6 notice in advance of bargaining. Well, the agreement… Well, we can figure out what the case means. And… There's no need to get a discussion from the district court. We can read the case for ourselves and figure out whether the district court misread it or not, right? This court may, yes. Also, I mean, the NLRA… It's a simple dispute whether this is a major or minor dispute. We can figure out the law ourselves. It is, but we would submit that in order to read the leading cases harmoniously and apply them to these very unique facts, we can hear it sat down at the table for quite some time to bargain. And then when it got a result it didn't like, said, oh, we had the management right all along to do this. That tells us that reading the cases as we suggest is the proper result to reverse the lower court's decision. Thank you, Mr. Praswell. We're going to move to the third case.